UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

RUSSELL HERLING,

                            Plaintiff,

       - versus -

NEW YORK CITY DEPARTMENT OF
EDUCATION and CARLSTON GRAY,

                           Defendants.

MEMORANDUM
AND ORDER
13-CV-5287 (JG)(VVP)

---

A P P E A R A N C E S:

    ZABELL & ASSOCIATES, P.C.
        1 Corporate Drive, Suite 103
        Bohemia, New York 10006
    By:    Saul D. Zabell
        *Attorneys for Plaintiff*

    ZACHARY W. CARTER
        Corporation Counsel of the City of New York
        100 Church Street, Room 2-142
        New York, New York 10007
    By:    Stephen P. Pischl
        *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

        Plaintiff Russell Herling brings this action against his employer, the New York City Department of Education ("DOE") and Carlston Gray, his direct supervisor, under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* Herling, a high school physical education teacher, alleges that defendants violated Title VII and the city and state human rights laws by discriminating against him on the basis of his race (Caucasian) and religion (Jewish).

On April 23, 2014, I granted defendants' motion to dismiss Herling's retaliation claim on statute of limitations grounds, and I denied their motion to dismiss Herling's additional discrimination claims. Specifically, I found that "any claims regarding acts that occurred before March 19, 2010, are barred as untimely, but may be considered as background evidence in support of timely claims." *See Herling v. New York City Dep't of Educ.*, No. 13-CV-5287 (JG), 2014 WL 1621966, at *5 (E.D.N.Y. Apr. 23, 2014). This included Herling's NYHRL and NYCHRL claims against the DOE. *Id.* at *11. Accordingly, the claims that remained after the motion to dismiss were Herling's Title VII claim against the DOE and his NYHRL and NYCHRL claims against Gray. Defendants now move for summary judgment on these remaining claims. I heard oral argument on August 13, 2015. For the reasons stated below, defendants' motion is denied.

## BACKGROUND

A.  *The Facts*[1]

Herling is a Caucasian, Jewish male who has worked as a high school physical education teacher at William E. Grady Career and Technical High School ("Grady High School") in Brooklyn since September 2001. Def. Rule 56.1 Stmt. ¶¶ 3-5; Pl. Rule 56.1 Stmt. ¶¶ 3-5. Carlston Gray served as assistant principal of Grady High School from February 2003 to July 2006 and principal from July 2006 to August 2010. Def. Rule 56.1 Stmt. ¶¶ 6-7; Pl. Rule 56.1 Stmt. ¶¶ 6-7. Gray was responsible for Herling's performance ratings for the 2009-10 school year. Def. Rule 56.1 Stmt. ¶ 9; Pl. Rule 56.1 Stmt. ¶ 9.

---

[1] Unless otherwise noted, the facts set forth here are either undisputed, or, if disputed, are viewed in the light most favorable to Herling, the nonmoving party. *See Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002).

1. *Instances of Lateness and Leaving the School Building*

Herling had a history of reporting late to work, and did so 12 times in the 2006-07 school year, 14 times in the 2007-08 school year, and 18 times in the 2008-09 school year. Herling's instances of lateness totaled six hours in 2006-07, over four hours in 2007-08, two hours in 2008-09, and over three hours in 2009-10. He received several written warnings about his lateness, and in April 2010, he was advised that because of his excessive tardiness, he would be referred to the BOE's Office of Labor Relations. Def. Rule 56.1 Stmt. ¶¶ 11-19.

Herling disputes the facts concerning his lateness but only to the extent that he asserts he was not late or absent "any more frequently than his peers" and did not "exceed the boundaries of his time and attendance allotment." *See* Pl. Rule 56.1 Stmt. ¶¶ 10-13. Herling also contends that Gray improperly relied on unsigned time sheets in making his determinations about Herling's absences, and that the content of Herling's timecards does not match the timesheets. Pl. Rule 56.1 Stmt. ¶¶ 11-13 (citing Pl. Ex. 14 (timesheets) and 15 (timecards)). Herling also says that Gray altered Herling's records by adding instances of lateness to them. *Id*. ¶ 17; Pl. Ex. 29 (Herling Dep.) at 38-39. Herling agrees that he received a disciplinary letter in April 2010 regarding lateness, but he says that other teachers, who are African American, were also subject to disciplinary hearings in March 2010 for "comparable" instances of lateness, but they were not given a performance rating of unsatisfactory for attendance, as Herling was. Pl. Rule 56.1 Stmt. ¶¶ 18, 25.

Defendants further note that on several occasions in late 2009 and early 2010, Herling failed to follow school policy requiring him to punch his time card when he arrived late, and he failed to sign in and out of the building when exiting the school during normal business hours. Def. Rule 56.1 Stmt. ¶¶ 20-33. Herling contests these allegations and points out that

3

Gray did not subject him to disciplinary action for failing to sign in and out of the building. Pl. Rule 56.1 Stmt. ¶¶ 20-33. Defendants assert that Gray accepted Herling's position that he did sign out of the building when he left, and thus Gray did not subject him to disciplinary action for the alleged infraction. Def. Rule 56.1 Stmt. ¶¶ 34-38. In May 2010 Gray wrote to Herling and said a custodian reported that Herling was jamming the door to the gym so that it would not close and Herling could enter and exit the building, and that action violated the school's security policy. Gray did not initiate disciplinary action against Herling on the basis of this allegation. Def. Rule 56.1 Stmt. ¶¶ 39-44.

Herling says that Gray enforced BOE policy on an inconsistent basis depending on the teacher's race and/or religion, but he does not deny the existence of the policy or the facts regarding Gray's actions in response to Herling's lateness. Pl. Rule 56.1 Stmt. ¶¶ 14-17. Herling does not dispute that he failed to follow school policy when he entered and exited the building. *Id*. ¶¶ 39-44.

2. *Standardized Fitness Tests*

Herling was required to administer a standardized fitness test to students who participated in the NYC Fitnessgram program and enter the results of the test into an electronic database. Defendants say that Herling only entered data for 24 out of 170 of his students, which was a 14.12% completion rate; the rate of the other physical education teachers was 90%. Def. Rule 56.1 Stmt. ¶¶ 45-49 (citing Def. Ex. T (Fitnessgram Report)). Herling points out that Gray's affidavit says that Herling completed fitness reports for 29% of eligible students. Pl. Rule 56.1 Stmt. ¶ 48, Def. Ex. B (Gray Aff.) ¶ 11. In June 2010, Gray met with Herling to discuss his failure to enter the data, and Herling said that he had entered the information but it was not submitted. When Gray looked into Herling's explanation, he found that only one

student's data was entered without also being submitted. As a result, Gray wrote a letter to Herling's personnel file advising him that he failed to complete the required task. Def. Rule 56.1 Stmt. ¶¶ 50-55.

Herling disputes the defendants' claim that he failed to follow the district's policy regarding the fitness program. He says he had difficulty logging onto the program and made multiple calls to the support line for the program seeking help. Herling says Gray failed to provide him with the training required to use the program to report data, and Gray did not try to assist Herling when he noticed there was a problem and instead waited to address the problem in an effort to injure Herling. Pl. Rule 56.1 Stmt. ¶¶ 45-55.

3. *Performance Rating*

In June 2010, Gray completed a personnel report for the 2009-10 school year, and Herling received an unsatisfactory rating ("U-rating") because of his attendance history and failure to follow school policy as explained above. Def. Rule 56.1 Stmt. ¶¶ 56-58. Specifically, Herling received markings of "U" in the areas of attendance and punctuality, professional attitude and professional growth, attention to records and reports, attention to routine matters, and willingness to accept special assignments in connection with the school program. His overall performance evaluation was also a "U." Def. Ex. C (Herling Performance Review). The report was dated June 18, 2010. *Id.*

Herling sought review of the U-rating, and after a three-member committee conducted a review in January 2011, they agreed that the U-rating should be sustained because of Herling's attendance records and his failure to comply with the fitness testing program. The Senior Deputy Chancellor wrote to Herling in February 2011 and informed him that his appeal was denied. Def. Rule 56.1 Stmt. ¶¶ 59-63.

Herling contests the information on which the U-rating was based. Pl. Rule 56.1 Stmt. ¶ 57. Additionally, he says that because six out of eight letters in his file on which his review was based were unsigned, those letters cannot be used for disciplinary action against Herling, according to school policy. *Id*. ¶ 58 (citing Def. Exs. 18(D), 19). Herling also points out that he received a satisfactory rating ("S-rating") for the 2006-09 school years. *Id*. ¶ 10.

4.  *Salary and Per-Session Work*

On March 1, 2009, Herling received a salary increase, at which point he was eligible for further increases based only on longevity increments after serving additional period of years. Under this system, the next pay increase that Herling was eligible for was on September 1, 2011. On September 1, 2011, Herling received an increase for longevity for having served for ten years. Def. Rule 56.1 Stmt. ¶¶ 64-70; Pl. Rule 56.1 Stmt. ¶¶ 64-70.

Herling contends that he was prevented from performing per-session activity for one year following his U-rating, meaning until June 2011. Pl. Rule 56.1 Stmt. ¶¶ 65, 75-78. Per-session work included opportunities for teachers to earn additional pay through participation as coaches in sports programs or in other extracurricular activities. Job postings for per-session activities indicated that a teacher's ratings for prior years would be one of the factors considered when selecting candidates for per-session work. Herling did not apply to any per-session work during the time Gray was principal of Grady High School. Def. Rule 56.1 Stmt. ¶¶ 71-77. Herling says he was involved with two per-session activities at the school, but that was on a volunteer basis. *Id.* ¶¶ 78-81.

Herling contends that Gray failed to post available per-session positions, and when Herling told Gray he was interested in per-session work prior to the 2009-10 school year, Gray said Herling was not sufficiently "Afrocentric" for the positions and Herling would never

6

be hired. Herling also says that Gray filled the per-session positions that he did not post with unqualified African American candidates, one of whom who was a plumber and another who was Gray's son, a photographer. Pl. Rule 56.1 Stmt. ¶¶ 65-66, 72. Herling contends that Gray issued U-ratings to white coaches for track, soccer, basketball, and junior varsity basketball that prevented them from performing per-session work and instead hired African Americans to replace those coaches. *Id.* ¶ 73. Herling says that he was prevented from per-session work during Gray's tenure as principal, but under Principal Maione, per-session work positions have been posted and Herling has applied for those opportunities. *Id.* ¶¶ 77-81.

5. *Discriminatory Remarks by Gray*[2]

Herling contends that Gray has made remarks evidencing animus based on Herling's race and religion. The first of those allegations concerns an instance in January 2007, when Herling sought to be excused from work to attend religious services for his grandmother's funeral. In response, Gray requested that Herling provide him with a card from a religious "Mass" (a "Mass card") for his absence to be excused. Def. Rule 56.1 Stmt. ¶ 86 (quoting Def. Ex. A (Am. Compl.) ¶¶ 42-43; Pl. Rule 56.1 Stmt. ¶ 86. Gray admits that he asked Herling for documentation regarding his request to be absent, but he denies telling Herling he would need a Mass card to be excused. Def. Rule 56.1 Stmt. ¶¶ 87-88. Herling notes that Martin Rosenthal, a former special-education teacher at Grady High School, witnessed Herling being questioned about documentation from Gray, and Rosenthal thought the questioning was racist and anti-Semitic. Pl. Rule 56.1 Stmt. ¶ 86; Pl. Ex. 33 (Rosenthal Dep.) at 20-22. Herling also notes that Taj Graham, another teacher, issued a statement that about ten teachers also filed EEOC actions

---

[2] Although several of these alleged discriminatory remarks occurred before March 19, 2010, the beginning of the relevant time period for statute of limitations purposes, I discuss all of them here as background evidence in support of Herling's timely claims. *See Herling*, 2014 WL 1621966, at *5.

7

against Gray for discriminatory practices against white employees. Pl. Rule 56.1 Stmt. ¶ 86 (citing Pl. Ex. 20 (Graham Aff.) at 1-2).

The next allegation is that on February 4, 2008, Gray disciplined Herling for wearing a yarmulke. Def. Rule 56.1 Stmt. ¶ 89 (citing Def. Ex. A (Am. Compl.) ¶ 49). Herling says that after he wore a yarmulke covered by a baseball cap, Gray demanded that he remove both items by sending him a cease and desist letter on March 3, 2008. Pl. Rule 56.1 Stmt. ¶ 89; *see also* Def. Rule 56.1 Stmt. ¶ 93 (citing Def. Ex. CC (March 3, 2008 Letter)). Gray asked Herling why he had the hat and Herling said he wore the hat to cover a wound from a recent surgery and for religious reasons, but Gray still asked Herling to remove the hat and yarmulke. *See* Def. Rule 56.1 Stmt. ¶ 91; Pl. Rule 56.1 Stmt. ¶ 91; Pl. Ex. 30 (Gray Dep.) at 33-36. Later, after he received a call from the DOE's legal department telling him the BOE did not have a dress code policy, Gray wrote a letter of apology to Herling. Pl. Rule 56.1 Stmt. ¶ 91; Pl. Ex. 30 (Gray Dep.) at 91-92.

Additionally, in May 2008, Gray allegedly denied funding for transportation for the Grady High School volleyball team because volleyball is a "white sport." Def. Rule 56.1 Stmt. ¶¶ 83-84 (quoting Def. Ex. A (Am. Compl.) ¶ 18). Herling's support for this allegation comes from a newspaper article, which quotes Ms. Cordero, the boys' volleyball coach, as saying that Gray told her volleyball is a white boys' sport. Def. Rule 56.1 Stmt. ¶ 84; Pl. Rule 56.1 Stmt. ¶ 84; *see also* Pl. Ex. 30 (Gray Dep.) at 52-55. Gray denies that he ever made such a statement. Herling also says that Cordero was subjected to retaliation as a result of the article by Gray watching Cordero on a daily basis and "subject[ing] her to heightened scrutiny for her performance." Def. Rule 56.1 Stmt. ¶ 85; Pl. Rule 56.1 Stmt. ¶ 85.

Herling also alleges that at least once in March 2009, when Herling was at the Kosher food table, Gray told Herling in front of his co-workers that if he didn't "eat the kosher food," he would "go to hell." Def. Rule 56.1 Stmt. ¶ 95 (citing Def. Ex. A (Am. Compl.) ¶ 57). Herling says the event was witnessed by several of Herling's colleagues, and also that Gray told Herling he "would be better off if he [Herling] wore an African Kuffie." Pl. Rule 56.1 Stmt. ¶ 96; Pl. Ex. 24 (Guida Aff.). Gray denies making any such statement. Def. Rule 56.1 Stmt. ¶ 96.

6. *Allegations of Disparate Treatment*

Herling alleges that non-white, non-Jewish teachers received preferential treatment from Gray. Def. Rule 56.1 Stmt. ¶ 97 (citing Def. Ex. A (Am. Compl.) ¶¶ 36-40). First, he alleges that during the 2009-10 school year, teacher Dawn Watson, who is African American, was absent from work for six weeks but nonetheless received an S-rating for that year. Def. Rule 56.1 Stmt. ¶ 98 (citing Def. Ex. A ¶ 36). Defendants contend that Herling has no knowledge of the circumstances of Watson's six-week absence, but Herling cites to a letter from Gray to Watson where Gray calls the absences "excessive" and an "abuse of the system." *See* Def. Rule 56.1 Stmt. ¶ 99; Pl. Rule 56.1 Stmt. ¶ 99; Pl. Ex. 7 (Dec. 16, 2009 Letter to Watson).

Herling alleges that Gray falsely accused him of inappropriate grading practices by passing a student who was absent 37 times, but none of the other teachers (all African American) received a reprimand or warning concerning the same student who was also absent in their classes as well. Def. Rule 56.1 Stmt. ¶¶ 100-01 (citing Def. Ex. A ¶¶ 38-39). Herling notes that the student in question was absent from his class only seven times and was absent from other teachers' classes more frequently. Pl. Rule 56.1 Stmt. ¶ 101 (citing Pl. Ex. 17 (student attendance report)).

Regarding his March 2010 disciplinary action for lateness, Herling alleges that similarly-situated African American workers who were late more times than Herling were not subject to similar disciplinary action. Def. Rule 56.1 Stmt. ¶ 104 (citing Def. Ex. A ¶ 29). Herling refers to Melvin Manning and Hugh Bryant, two African American co-workers, who teach math. *Id*. ¶¶ 105-06. Herling also contends that when he spoke with Manning and Bryant about the issue, they told him they were not concerned because Gray would not discipline them since they are African American. Pl. Rule 56.1 Stmt. ¶¶ 105-06; *see also* Pl. Ex. 23 (Manning Stmt.).

Herling alleges that it was Gray's practice to issue U-ratings to white teachers who held per-session positions in order to replace them with African American teachers. Def. Rule 56.1 Stmt. ¶ 109 (citing Def. Ex. A ¶ 64). As explained above, Herling also says Gray's practice was to award the per-session work to African American teachers regardless of their qualifications. *Id*. ¶ 110; Pl. Rule 56.1 Stmt ¶¶ 109-10. Herling gives the example of Gray's giving a U-rating to Guido Caligara, the boys' soccer coach, who was replaced by Stenrick Adams, who is African American. Herling says Gray did not post the position before hiring Adams, as required by school policy. *Id*. ¶ 111-13; Def. Rule 56.1 Stmt. ¶¶ 111-13.

7. *Complaints to Superintendent Waite*

Herling alleges that in April 2008, he complained to Superintendent Linda Waite about Gray's discriminatory conduct. He says that Waite did not address his complaint, but instead gave Herling's personal cell phone number to Gray, who then called Herling and threatened him. Waite denied any such contact with Herling, and said it would be unusual for a teacher to contact her. Gray also denied knowing whether Herling ever contacted Waite. Def. Rule 56.1 Stmt. ¶¶ 114-18 (citing Def. Ex. A ¶¶ 53-54); Pl. Rule 56.1 Stmt. ¶¶ 114-18.

DISCUSSION

On this motion for summary judgment, defendants argue that Herling has failed to establish a prima facie case of discrimination under Title VII, the NYSHRL, and the NYCHRL.

A.   *The Standard of Review*

A court may grant summary judgment if the moving party shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson*, 278 F.3d at 101 (citation omitted).

On the other hand, in order "[t]o survive summary judgment . . . the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Reiseck v. Universal Commc'ns of Miami*, No. 06-CV-777 (TPG), 2012 WL 3642375, at *2 (S.D.N.Y. Aug. 23, 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11 (1986)).  However, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact[,]" *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), and the "mere existence of a scintilla of evidence" is not sufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

B.     *The Title VII Claim*

In assessing a defendant's motion for summary judgment on a Title VII claim, courts generally apply the burden-shifting framework first adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* This burden is not difficult to meet, as even a *de minimis* showing may be sufficient to establish a prima facie case. *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

If the plaintiff satisfies this initial burden, the burden shifts to the defendant to offer a nondiscriminatory reason for its action. *Ruiz*, 609 F.3d at 492. If the defendant provides such a reason, the motion for summary judgment may still be denied if the plaintiff can show that the defendant's proffered reason is a pretext for discrimination. *See United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011); *Ruiz*, 609 F.3d at 492. To show pretext, a plaintiff is not "required to prove the employer's stated justification was asserted with intent to deceive or in bad faith;" rather, he must simply show that "discrimination played a role in an adverse employment decision." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010).

As I explained in my April 2014 decision, Title VII claims may not proceed against individuals. Therefore, Herling's only remaining Title VII claim is against the DOE. *See Herling*, 2014 WL 1621966, at *10 (citing *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)).

1.     *Prima Facie Case of Discrimination*

To establish a prima facie case of employment discrimination, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held;

(3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894 (JG)(JO), 2012 WL 3288234, at *4 (E.D.N.Y. Aug. 10, 2012) (quoting *Ruiz*, 609 F.3d at 491-92). Here, the defendants do not contest the first two elements of Herling's prima facie case. However, they argue that Herling has failed to establish that his U-rating amounted to an adverse employment action, and that the circumstances of the rating do not give rise to an inference of discrimination.

      a.  *Adverse Employment Action*

    First, for Herling's U-rating to qualify as an "adverse employment action," he must "proffer objective indicia of material disadvantage." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008). My April 2014 decision found that denying Herling "the opportunity to work overtime, comp time, or additional per-session employment may . . . constitute an adverse employment action." *Herling*, 2014 WL 1621966, at *6 (citing *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006)); *see also Montgomery v. Chertoff*, No. 03-CV-5387 (ENV)(JMA), 2007 WL 1233551, at *12 (E.D.N.Y. Apr. 25, 2007) ("Not being assigned overtime can result in a material loss of pay and may be considered an adverse act."). Additionally, "[t]he Second Circuit has made clear that the concept of an adverse employment action has been defined broadly and that whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination." *Id.* (internal quotations omitted).

    Whether Herling has created a question of fact in this regard is a close call. Herling does not argue that his salary was affected by his U-rating, but instead he argues that this rating was an adverse action because it prevented him from holding per-session positions, which were opportunities to earn more money. *See* Pl. Br. at 10.

In this regard, Herling testified that he was barred from applying for per-session work because of the U-rating. Pl. Ex. 29 (Herling Dep.) at 89-90. Fellow teacher Guido Caligara also testified that a U-rating precluded a teacher from performing per-session work. Pl. Ex. 32 (Caligara Dep.) at 22. Although defendants argue that the per-session job postings make clear that a candidate's rating was just one factor to be considered (*see* Def. Reply at 4), the job postings themselves include "prior years' satisfactory ratings, record of attendance and punctuality to present" as one of the "selection criteria" for a per-session position. Def. Ex. Z (Per-Session Job Postings 2010-11). When viewing this evidence in the light most favorable to Herling, a jury could reasonably conclude that the S-rating was a requirement for selection and not merely part of the criteria used to determine eligibility.

Herling's failure to apply to the per-session postings is not a bar to his discrimination claim. Generally, to state a claim for failure to hire, a plaintiff must show that he applied for a specific position and was rejected. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998). However, if a plaintiff can show that completing an application "would have been futile based on an employer's discriminatory practices," he need not show that he formally applied. *Pelaez v. Life Alert, Inc.*, No. 09-CV-1668 (CBA)(LB), 2011 WL 1321999, at *4-5 (E.D.N.Y. Mar. 30, 2011) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)). Courts in this circuit have applied this "futile gesture doctrine" in situations like Herling's where the employer is "aware that the individual intends to apply for a position or benefits, but nevertheless specifically tells them not to apply, allegedly for discriminatory reasons." *Pelaez*, 2011 WL 1321999, at *5 (citing cases).

Finally, defendants make an argument that the timing of Herling's U-rating would have been irrelevant to his consideration for per-session work in 2010-11, since he received the

14

U-rating on June 18, 2010, and applications were due by June 11, 2010, more than a week earlier. Def. Br. at 8. But a reasonable juror could conclude that the rating would nonetheless affect Herling's chances of receiving a per-session position for the following school year.

For these reasons, Herling has created a question of fact sufficient to allow a reasonable juror to conclude that the U-rating prevented him from per-session work.

      b.      *Inference of Discrimination*

Herling has established that the circumstances surrounding the U-rating give rise to an inference of discrimination. This fourth element of a prima facie case "can be established in a variety of ways depending on the specific facts of the case." *White v. Andy Frain Servs., Inc.*, No. 12-CV-5868 (JG)(VVP), 2014 WL 3896066, at *6 (E.D.N.Y. Aug. 8, 2014) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (additional citations omitted). "Title VII plaintiffs often establish an inference of discrimination by showing that they were treated differently from other similarly-situated employees, or by adducing evidence of 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus.'" *Id.* (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)) (internal citation omitted).

Herling has put forward several items of evidence in support of his claim that his U-rating occurred in circumstances that give rise to an inference of discrimination. Most probative is that before the start of the 2009 school year, when Herling went to Gray's office to ask about being hired for per-session work as a soccer coach, Gray told Herling he could not submit a written application for the position because Herling was "not Afrocentric enough." Pl. Ex. 29 (Herling Dep.) at 76-79. This discriminatory remark from Gray suggests that Herling was prevented from performing per-session employment entirely because of his race.

15

District courts in this circuit have considered four factors in deciding whether a remark is probative. They consider "(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry*, 616 F.3d at 149; *see also Sethi v. Narod*, 12 F. Supp. 3d 505, 539 (E.D.N.Y. 2014) (applying these factors). The "Afrocentric" remark was made by Gray, the decisionmaker, in direct relation to the issue in question, namely, whether Herling would be considered for per-session work. The only factor that weighs against the remark's probative value is that it was made before the start of the 2009-10 school year, and Herling did not receive the U-rating until June of 2010. However, a reasonable juror could conclude that the remark was one example of discriminatory conduct by Gray against Herling that lasted throughout the school year based on this and the other discriminatory remarks mentioned above.

Next, Herling has put forward some evidence of disparate treatment between himself and similarly-situated African American colleagues. "A showing of disparate treatment – that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group – is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493-94 (internal quotations omitted). An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Id.* (internal quotations omitted).

16

In this regard, Herling has presented five African American teachers' personnel files who he says have attendance and tardiness problems comparable to his own, and he shows that these teachers received S-ratings for attendance. Indeed, the attendance records show that Herling was absent seven times and had a total of three hours and 38 minutes of lost time due to lateness. *See* Pl. Opp. at 16; Pl. Ex. 12 (Herling personnel file). The other teachers had as much as six hours and 58 minutes of total lost time, but they did not receive U-ratings for attendance. *See id.*; Pl. Exs. 7-11 (other teachers' personnel files). Gray's deposition testimony also acknowledges the teachers had similar instances of lateness and absence but did not receive U-ratings in this category on their evaluations. *See* Pl. Ex. 30 (Gray Dep.) at 245-50.[3]

Finally, Herling has presented evidence that Gray displayed a pattern of discriminatory conduct by awarding per-session work to African American employees over white employees. For support, Herling points to his own deposition testimony and the testimony of Guido Caligara, the boys' soccer coach who was given a U-rating and then replaced by Stenrick Adamas, an African American teacher. Pl. Rule 56.1 Stmt. ¶ 109; Pl. Ex. 32 (Caligara Dep.) at 23-24, 26-28. Although these individual instances of discriminatory conduct fall short of establishing a pattern, they add to the evidence that weighs in favor of Herling's having established a prima facie case of discrimination.

2.   *The Defendants' Non-Discriminatory Reason and Evidence of Pretext*

Because Herling has stated a prima facie case, the burden shifts to the defendants to produce a "legitimate, nondiscriminatory reason" for the challenged employment decision. *Quinones v. Atl. Hyundai*, No. 06-CV-1626 (TLM)(ARL), 2010 WL 681671, at *3 (E.D.N.Y. Feb. 25, 2010) (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

---

[3] One of those teachers who had more late time accrued than Herling, Melvin Manning, submitted a statement that said he believed Gray exhibited prejudice against Herling by issuing him the U-rating, which Manning thinks was an "injustice." Pl. Ex. 23 (Manning Stmt.).

17

The defendants have met this burden by establishing evidence of Herling's lateness, entering and exiting the building without permission, and failing to comply with the requirements of the physical fitness exam, all of which are discussed above. This evidence is sufficient to shift the burden back to Herling. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) ("It is not our task, at the second stage of the *McDonnell Douglas* framework, to assess the credibility of these witnesses; nor is it our role to determine whether the [defendant's] explanation of its action is convincing. Instead, we ask whether defendant has introduced evidence that, taken as true, would permit the conclusion that there was a nondiscriminatory reason.") (internal quotations, citation, and emphasis omitted).

To avoid summary judgment after the defendants have set forth a nondiscriminatory reason for the U-rating, Herling "must show that the employer was more likely than not motivated by a discriminatory reason or that the employer's reason is unworthy of belief." *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 165-66 (E.D.N.Y. 2014) (citing *Burdine*, 450 U.S. at 256). This means that Herling needs to raise sufficient evidence for a reasonable jury to find his race and religion played a role in Gray's decision to give him the U-rating. *See Holcomb*, 521 F.3d at 141.

Herling has established that there is a genuine issue of fact requiring trial relating to the circumstances surrounding his U-rating. Because of Gray's remarks that Herling was not "Afrocentric enough" for per-session work, and because Gray was quoted as saying volleyball was a white person's sport, a reasonable juror could conclude that Gray was at least in part motivated to give Herling the U-rating to bar him from per-session work. Herling's other racist comments to Gray about wearing a head covering and eating Kosher food also weigh in favor of a reasonable jury being able to find in Herling's favor. *See Holcomb*, 521 F.3d at 142 ("A

18

plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation.") (internal quotations omitted).

To be sure, Herling has not shown that his U-rating was entirely undeserved. But he has presented enough evidence to show that Gray may have been motivated to give him the rating for improper reasons. Because of this, the defendants' motion for summary judgment on Herling's Title VII claim is denied.

C.   *The NYSHRL and NYCHRL Claims*

As I explained in my April 2014 decision, Herling's only remaining NYSHRL and NYCHRL claims are against Gray for discrimination and as an aider and abettor of the discriminatory conduct. *See Herling*, 2014 WL 1621966, at *12. With respect to Herling's NYSHRL and NYCHRL claims, I note that claims under the NYSHRL are evaluated according to the same standard for federal discrimination claims. *See Everson v. New York City Transit Auth.*, No. 02-CV-1121 (ENV)(JMA), 2007 WL 539159, at *17 (E.D.N.Y. Feb. 16, 2007) (citing *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006)). Therefore, for the same reasons discussed above, Herling's NYSHRL claim may proceed to trial and summary judgment on this ground is denied.

Finally, Herling's claim under the NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011) (internal quotations omitted)). To establish a NYCHRL claim, a plaintiff "need only demonstrate by a preponderance of the

evidence that []he has been treated less well than other employees because of [his] [protected status]." *Id.* at 110 (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 39 (2009)). Because I have denied summary judgment under the more stringent *McDonnell-Douglas* standard for the federal and state discrimination claims, I must also deny summary judgment under this more lenient standard.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is denied. Herling's claim under Title VII may proceed against the DOE, and his claims under the NYSHRL and NYCHRL may proceed against Gray.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 10, 2015
       Brooklyn, New York